**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| **VELVET MAXWELL and SHOSHANA MAXWELL, heirs-at-law of Norman Maxwell, Deceased,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No.:** |
| **v.** | ) ) | **NOTICE OF REMOVAL CIVIL ACTION** |
| **BREEZY OPERATIONS, LLC d/b/a Butler Center for Rehabilitation and Healthcare,** | ) ) ) ) | |
| **Defendant.** | ) | |

# EXHIBIT A

Electronically Filed - Bates County Circuit Court - August 10, 2022 - 03:39 PM

IN THE CIRCUIT COURT OF BATES COUNTY, MISSOURI

| | |
|---|---|
| VELVET MAXWELL and SHOSHANA MAXWELL, heirs-at-law of Norman Maxwell, Deceased, | ) ) ) ) |
| Plaintiffs, | ) )   Case No.: |
| v. | ) ) ) |
| BREEZY OPERATIONS, LLC d/b/a Butler Center for Rehabilitation and Healthcare, <u>Serve Registered Agent</u>: C T Corporation System 120 South Central Ave. Clayton, MO 63105 | ) ) ) ) ) ) ) ) ) ) |
| Defendant. | ) ) |

## PETITION FOR DAMAGES

Plaintiffs Velvet Maxwell and Shoshana Maxwell ("Plaintiffs"), heirs-at-law of Norman Maxwell, Deceased, for their Petition for Damages against Defendant Breezy Operations, LLC d/b/a Butler Center for Rehabilitation and Healthcare, state the following:

## PARTIES

1.    Plaintiff Velvet Maxwell is a resident of North Las Vegas, Clark County, Nevada, and is a surviving daughter and heir of Norman Maxwell, deceased.

2.    Plaintiff Shoshana Maxwell is a resident of Portland, Multnomah County, Oregon, and is a surviving daughter and heir of Norman Maxwell, deceased.

3.    Plaintiffs, as children of the deceased, Norman Maxwell, are considered class 1 persons authorized to bring this action pursuant to RSMo.§ 537.080.1 (1).

4.    Defendant Breezy Operations, LLC d/b/a Butler Center for Rehabilitation and Healthcare, 416 S. High Street, Butler, MO 64730 ("Defendant"), is a Missouri limited liability

1

company in good standing and authorized to do business under Missouri law with its registered agent in Clayton, Missouri and is engaged in the business of providing health care, medical services, therapy, rehabilitation, skilled nursing care, and custodial services to the general public.

5.　　At all times relevant, Defendant owned, operated, managed, and/or controlled the skilled nursing facility known as Butler Center for Rehabilitation and Healthcare, 416 S. High Street, Butler, MO 64730, and engaged in the business of providing health care, medical services, therapy, rehabilitation, skilled nursing care, and custodial care services to the general public.

## AGENCY

6.　　At all times relevant, Defendant was acting by and through its nurses, agents, servants, and employees in providing care to Norman Maxwell.

7.　　At all times relevant, the nurses, agents, servants, and employees of Defendant that provided care to Norman Maxwell were acting within the course and scope of their employment with Defendant.

8.　　At all times relevant, Defendant owed duties, some of which were non-delegable, to the residents of the facility known as Butler Center for Rehabilitation and Healthcare, including Norman Maxwell, such duties being conferred by statute, existing at common law, and/or being voluntarily assumed by Defendant.

## JURISDICTION AND VENUE

9.　　This Court has jurisdiction over Defendant because, at all times relevant, Defendant conducted business in the State of Missouri and, by and through its respective agents, representatives, or employees, Defendant committed tortious acts within the State of Missouri.

2

10.     Venue is proper in this Court, pursuant to RSMo.§ 508.010, because the decedent, Norman Maxwell, was first injured in Butler, Bates County, Missouri.

## FACTUAL BACKGROUND

11.     Norman Maxwell was admitted to Butler Center for Rehabilitation and Healthcare (hereinafter "the Facility") on July 16, 2020 from Kansas City Center for Rehabilitation and Nursing after that facility closed for business.

12.     When Mr. Maxwell was admitted to the Facility, he was noted as being alert and oriented to person only, able to transfer with supervision, with no skin issues and no issues with malnourishment. Mr. Maxwell's weight was 161 pounds upon admission.

13.     Upon admission on July 16, 2020, a fall risk evaluation was completed that stated Mr. Maxwell had not fallen in the past 90 days, that he was able to ambulate without problems and without devices, and that his balance was not steady, but he was able to stabilize without physical assistance. A nutrition assessment was completed on this same date stating that Mr. Maxwell's appetite was good, and his current meal intake was adequate.

14.     Mr. Maxwell's Braden Scale Score was completed on July 17, 2020, and his score was 13 which put Mr. Maxwell at risk for skin breakdown.

15.     On July 18, 2020, an AIMS test was completed on Mr. Maxwell that noted he had no involuntary movements in his upper or lower extremities and that his dental status was appropriate regarding involuntary movements.

16.     On July 20, 2020, a care plan was placed regarding Mr. Maxwell's potential for nutritional problems due to his diagnoses of cerebrovascular accident, aphasia, diabetes mellitus, and hypertension. A nutritional evaluation along with a nutritional assessment was completed on this date that stated Mr. Maxwell weighed 160 pounds and it was recommended that Mr. Maxwell's carb-controlled diet be discontinued to encourage oral intake in new surroundings.

3

17.     On July 22, 2020, care plans were placed to address Mr. Maxwell's potential for pressure ulcer development as well as his potential for complications due to his diagnoses of hemiplegia and hemiparesis.

18.     On July 23, 2020, an MDS was completed that stated Mr. Maxwell's functional status was independent and his skin was intact with no pressure ulcers noted. The MDS also made note of skin integrity interventions to prevent breakdown, such as pressure reducing devices for Mr. Maxwell's bed and chair. The next day a new Braden Scale was completed for Mr. Maxwell with a score of 14.

19.     On July 31, 2020, Mr. Maxwell's Braden Scale score had increased to 20. This documentation was not in line with the two previous Braden Scale scores. On August 1, 2020, Mr. Maxwell's Braden Scale score was now 21; however, none of his physical diagnoses or abilities had changed since admission.

20.     On August 13, 2020, Mr. Maxwell fell. He was found to be in a sitting position with both legs in front of him on the floor beside his bed. He was helped with assist of two back into bed and he was reminded that he needed to wear proper footwear when he was out of bed.

21.     On September 7, 2020, a care plan was placed due to Mr. Maxwell's previous fall. The next week an assessment noted his skin to be intact.

22.     On September 26, 2020, Mr. Maxwell fell again, and was found on the floor by another resident who notified staff. Upon assessment by staff, Mr. Maxwell was documented as lying on his right side, parallel to the bed between the bed and door.

23.     On October 14, 2020, a nursing evaluation was completed that stated Mr. Maxwell was 164 pounds, was independent with transferring, moving in bed, walking, dressing, eating, and toileting. His mobility was documented as having full range of motion and no issues with mobility. Additionally, Mr. Maxwell's skin integrity was noted as normal and warm, his weight was listed

4

as stable, and he was documented as not having any falls in the past 2-6 months, which is simply not accurate.

24.     On October 19, 2020, Mr. Maxwell's fall care plan was updated due to his recurrent falls. There is no indication of staff interventions to include frequent rounding for safety, use of nonskid footwear, or that of a bed/chair alarm with his underlying history of dementia and known impulsivity.

25.     On October 21, 2020, a lift and transfer evaluation noted that Mr. Maxwell was able to independently transfer to and from bed, chair, and toilet. Later this day, however, Mr. Maxwell fell again. Per the nurses note, Mr. Maxwell was found sitting on the floor by a CNA. He was helped into bed by the staff. No additional care plan measures were listed as being implemented.

26.     On October 21, 2020, a fall risk evaluation was completed that states Mr. Maxwell had 3 or more falls in the past 90 days. Per the evaluation, Mr. Maxwell was able to ambulate without problems and devices and his balance was still considered not steady but able to stabilize without physical assistance.

27.     On October 21, 2020, it was documented that Mr. Maxwell was having difficulty bearing weight to his right leg and that he had edema and bruising on his right ankle and foot.

28.     On October 24, 2020, a nutrition assessment was completed on Mr. Maxwell noting a weight of 164 pounds and stated that Mr. Maxwell's appetite was good, and his meal intake was adequate.

29.     On November 2, 2020, Mr. Maxwell fell again. Per the nurse's note, the nurse was called down to Mr. Maxwell's room, walked in and saw Mr. Maxwell with his legs up on the bed and lying on his back on the floor with his wheelchair next to him. The staff assisted Mr. Maxwell into bed.

5

30.     On November 2, 2020, a weekly skin report was completed on Mr. Maxwell. Per this report, Mr. Maxwell had a skin tear and a blister to the top of his right foot.

31.     On November 2, 2020, a fall risk evaluation was completed for Mr. Maxwell. This fall risk evaluation stated that Mr. Maxwell ambulated with problems, used devices, his gait was unsteady, and his balance was unsteady, and he was unable to stabilize without physical assistance. This appears to be a major change from his last evaluation, and he was having difficulty bearing weight on his right leg after a previous fall.

32.     On November 6, 2020, Mr. Maxwell's fall care plan was updated, stating that he fell due to poor balance and an unsteady gait. Previous documentation of Mr. Maxwell's gait and balance show that it had dramatically declined after he fell and was having difficulty bearing weight on his right lower extremity.

33.     On November 6, 2020, Mr. Maxwell refused to allow staff to treat the wound on his right foot. There is no indication that this was reported to Mr. Maxwell's primary physician or family in order to keep Mr. Maxwell safe and free of complications due to his foot injury.

34.     On November 9, 2020, Mr. Maxwell's weekly skin report documented that Mr. Maxwell had a skin tear and an abrasion to the top of his right foot. Mr. Maxwell's skin abrasion was documented as having a wound bed that was eschar-thick, hard leathery, and black. There is no indication that Mr. Maxwell's primary physician nor his family were notified. His weekly skin evaluation noted blisters to the top of his right foot, but no open areas.

35.     On November 17, 2020, Mr. Maxwell's weekly skin report noted that the skin tear on his right foot was healed but that the abrasion to his right foot had not changed.

36.     On December 4, 2020, Mr. Maxwell's weekly skin report documented his right foot abrasion as having a pink, pale wound bed as opposed to the necrotic wound bed that had

6

been described in previous skin reports and evaluations. Mr. Maxwell was noted as being in pain from the wounds.

37.     On December 10, 2020, Mr. Maxwell fell, for a fifth time since admission. Per the nurse's note, Mr. Maxwell was sitting on the floor beside his bed with his right arm up on the bed and his head resting on his arm. Mr. Maxwell stated that he was not sure what had happened.

38.     On December 10, 2020, a message was left with Mr. Maxwell's primary physician concerning his wounds and his right lower limb. His weekly skin report noted that his right foot abrasion had pink, pale tissue, and slough on this date. Per the documentation, Mr. Maxwell's right lower extremity was red, swollen, and warm to the touch. An order for Bactrim was placed with a diagnosis of cellulitis of Mr. Maxwell's right lower extremity.

39.     Over the next few days, Mr. Maxwell was confused during this time, without indication of notification to family members.

40.     On December 17, 2020, Mr. Maxwell's weekly skin report noted that his abrasion had improved, and it was described as pink, pale with dark pink and red tissue. It was also noted to have some slough.

41.     On December 24, 2020, a weekly skin report was completed on Mr. Maxwell that documented a right foot abrasion with a wound bed that was black and necrotic. This is an extremely different description of this wound than from December 17, 2020. This date was the first documentation of a new left hip pressure wound despite it being stated as deteriorated and at stage 3, indicating that it was not a new wound. A call was placed to Mr. Maxwell's physician for orders.

42.     On December 29, 2020, Mr. Maxwell's weekly skin report noted that he continued to have a necrotic abrasion to the top of his right foot, a pressure ulcer to his left hip that was stage

3, and he had developed a pressure ulcer on his right hip that was already at a stage 2 and had serosanguineous exudate.

43. On December 31, 2020, a patient at risk note was completed by the staff. The focus area of the note was weights, falls, behaviors, wounds, and restraints. Per this note, Mr. Maxwell had a 10-pound weight loss in 30 days as well as the development of a pressure ulcer on his left trochanter. It stated that Mr. Maxwell now required a Hoyer lift for transfers. Additionally, this note stated that Mr. Maxwell's bilateral lower extremities and left arm were becoming weaker and losing mobility.

44. On this date Mr. Maxwell suffered another fall. Per the nurses note, Mr. Maxwell was observed lying on the floor mat next to his bed. He stated he was looking for something.

45. On January 4, 2021, Mr. Maxwell fell again. Per the nurses note, the staff at the Facility were notified by another resident that Mr. Maxwell was on the floor. Upon entering the room, the nurse noted that Mr. Maxwell was lying on his right side with his feet tangled in his blankets. Mr. Maxwell was screaming and reporting severe pain.

46. On January 4, 2021, Mr. Maxwell was sent to Bates County Memorial Hospital Emergency Department for evaluation and treatment. A CT scan of the pelvis and hip showed no fracture, and he was transferred back to the Facility in the early hours of January 5, 2021.

47. On January 7, 2021, occupational therapy services were discontinued. An MDS was completed this day that documented that Mr. Maxwell was totally dependent with bed mobility, transfers, dressing, toilet use, and personal hygiene. He needed extensive assistance for locomotion, he was unable to ambulate at all, needed a wheelchair, and he needed assistance with eating. Furthermore, Mr. Maxwell had lost more weight unintentionally and he had multiple pressure ulcers.

8

48.     On January 8, 2021, Mr. Maxwell was noted to be having signs and symptoms of increased pain in his hips. A message was left with Dr. Miller, Mr. Maxwell's primary care physician, and an order was received for a fentanyl patch to be placed and removed every 72 hours for pain.

49.     On January 8, 2021, a nutrition note stated that Mr. Maxwell's weight had decreased to 140 pounds, a significant loss, and the dietician recommended for Mr. Maxwell to consume Med pass three times daily.

50.     On January 8, 2021, Mr. Maxwell's risk for nutritional problem care plan was updated, as well as his pressure ulcer care plan. A weekly skin report was completed noting multiple wounds, including a necrotic right foot abrasion, right and left hip pressure ulcers with the right hip ulcer deteriorating, a moisture associated skin damage wound to his right posterior scrotum, a lateral right foot blister, and necrotic right little toe.

51.     On January 14, 2021, a nursing evaluation noted that Mr. Maxwell remained dependent for transferring, moving in bed, walking, dressing, toileting, hygiene, and bathing. This evaluation made note of Mr. Maxwell's contractures and stated that range of motion exercises had not been attempted in the past quarter. Mr. Maxwell's skin integrity was documented as normal and warm, his diet was listed as regular with supplements, and he was noted to have had at least one fall in the past month. His fall risk assessment stated that Mr. Maxwell was confined to a chair and that he had not had a history of falls in the past 90 days.

52.     On January 15, 2021, a daily pressure injury document noted that Mr. Maxwell had pressure injuries on bilateral hips as well as his sacrum. These injuries were documented as intact, dry, and odorless with dressings intact, and no pain reported.

9

Electronically Filed - Bates County Circuit Court - August 10, 2022 - 03:39 PM

53.     On January 16, 2021, Mr. Maxwell's daily pressure injury documentation noted that his pressure injuries all had a moderate amount of odorous drainage. Wound cultures were obtained, and the results were called to Dr. Miller's office on January 18, 2021.

54.     On January 18, 2021, a nurses note documented that Mr. Maxwell had lost 8 pounds in the past week and that Mr. Maxwell was adamantly refusing food, fluids, and supplements. This note also stated that Mr. Maxwell had continued to develop new wounds.

55.     On January 18, 2021, daily pressure injury document noted Mr. Maxwell's bilateral hip and sacral wounds still had a moderate amount of odorous drainage.

56.     On January 19, 2021, an order was received from Mr. Maxwell's primary physician to have Dr. Joyce see Mr. Maxwell for a wound consult as well as PEG tube placement and the consult was set up for January 25, 2021.

57.     On January 19, 2021, Mr. Maxwell's weight had decreased to 132 pounds. Mr. Maxwell had been 161-164 pounds in July of 2020. Mr. Maxwell's potential for nutritional problem care plan was updated. His primary physician added failure to thrive to his diagnosis list and ordered bilateral lower extremity dopplers as well as blood work and wound cultures of Mr. Maxwell's bilateral hips.

58.     On January 19, 2021 a weekly skin condition report stated that Mr. Maxwell's right foot abrasion had improved, his hip wounds had improved, his scrotum MASD *(moisture associated skin damage)* was healed, his right foot blister had no change, the right ankle wound was black and had deteriorated, and his sacrum was black with no progress noted.

59.     On January 21, 2021, a lift and transfer evaluation was completed on Mr. Maxwell that stated that Mr. Maxwell required a lift and swing device for transfer due to having no trunk strength or control, not being able to maintain a seated position, not being able to move independently from reclined to seated and requiring a 2 person assist.

10

60.     On January 22, 2021, it was documented that Mr. Maxwell weighed 128 pounds. Mr. Maxwell had lost 16.8 pounds in just 2 weeks in January of 2021.

61.     On January 24, 2021, Mr. Maxwell's right hip wound culture from January 21, 2021, noted that his wound was positive for Staphylococcus aureus, Proteus mirabilis, and Escherichia coli.

62.     On January 25, 2021, an MDS was completed on Mr. Maxwell that stated that Mr. Maxwell was totally dependent for bed mobility, transfers, locomotion on and off the unit, dressing, toilet use, and personal hygiene. Walking was not even attempted at this point. He also required limited assistance for eating. His nutritional status continued to be documented as weight loss with not being on a physician-prescribed weight loss regimen and his skin condition documentation stated that he had one stage 2 pressure ulcer and one stage 3 pressure ulcer.

63.     On January 25, 2021, Mr. Maxwell went to Bates County Memorial Hospital for a consultation with Dr. Joyce for his wounds and PEG tube insertion. Dr. Joyce's office completed vascular studies and noted that Mr. Maxwell had limited blood flow, if any, blood flow to his lower extremities per the nurses note. Dr. Joyce did not send Mr. Maxwell back to the Facility and instead referred him to Bates County Memorial Hospital Emergency Department.

64.     On January 25, 2021, Mr. Maxwell was evaluated in the Emergency Department and noted as not being a candidate for any type of vascular intervention except for amputation due to having contractures and not being able to walk.

65.     Mr. Maxwell was transferred from Bates County Memorial Hospital to Saint Luke's Hospital for care from Dr. Allsup, who had cared for Mr. Maxwell previously. Upon admittance to the Emergency Department at Saint Luke's Hospital, it was noted that the pulses on Mr. Maxwell's feet were not palpable and that his capillary refill to his lower extremities was

11

severely diminished. Mr. Maxwell was admitted to the hospital with orders for intravenous antibiotics for his gangrenous right foot.

66.     On February 12, 2021, Mr. Maxwell was discharged from Saint Luke's Hospital to The Groves Nursing Home Senior Health Center.

67.     On February 26, 2021, per Dr. Carma Lee, MD, who certified Mr. Maxwell for hospice, noted that upon admission to Defendant's Facility, Mr. Maxwell had been independently ambulating with a cane, continent of bowel and bladder, and independent for all activities of daily living with the exception of needing some assistance for bathing. After the transfer to Defendant's Facility, Mr. Maxwell began having a number of falls, experiencing weight loss, and he developed progressive immobility and peripheral diabetic and pressure ulcers. Additionally, Mr. Maxwell was noted as having been allowed to lose 21.9 percent of his body weight over 8-9 months. His primary diagnosis for admittance to hospice was type 2 diabetes with diabetic peripheral angiopathy with gangrene. He was also noted to be appropriate for hospice due to his weight loss with cognitive and functional decline.

68.     On April 30, 2021, Mr. Maxwell died while in hospice care. His death certificate lists the following causes of death: (1) wet and dry gangrene of right foot (4 months), (2) peripheral vasulcar disease (years), and (3) diabetes mellitus type 2 with peripheral angiopathy (years). Other significant conditions contributing to death include left cerebral infarction with right hemiplegia and severe protein calorie malnutrition.

69.     When Norman Maxwell was admitted to the Facility on July 16, 2020, he was incapable of independently providing for all his daily care and personal needs without reliable assistance. In exchange for financial consideration, he was admitted to the Facility to obtain such care and protection.

12

70.     Defendant, through advertising, marketing campaigns, promotional materials and information sheets, held out the Facility as being able to provide medical, skilled nursing, rehabilitation, therapy and custodial care services to elderly and frail individuals, including Norman Maxwell.

71.     Defendant assumed responsibility for Norman Maxwell's total healthcare, the provision of nutrition, hydration, activities of daily living, medical, skilled nursing, rehabilitation, and therapy.

72.     Defendant further assumed responsibility to provide Norman Maxwell with ordinary custodial and hygiene services.

73.     Defendant exercised complete and total control over the healthcare of all residents at the Facility, including Norman Maxwell.

74.     Defendant was controlled by its respective members and/or managers, who were responsible for the operation, planning, management and quality control of the Facility.

75.     The control exercised over the Facility by Defendant included, inter alia; cash management; cost control; setting staffing levels; budgeting; marketing; maintaining and increasing census; supervision of the facility administrator and director of nursing; supervision and oversight of the staff; development and implementation of nursing staff in-services; development and implementation of all pertinent policy and procedures; monitoring customer satisfaction; performing mock surveys; risk management; corporate and regulatory compliance; quality of care assessment; licensure and certification; controlling accounts payable and receivable; development and implementation of reimbursement strategies; retaining contract management, physician, therapy and dietary services; dictating census and payor source quotas for admissions to the Facility; and employing the facility-level, regional and corporate staff who together operated the Facility.

13

76. Defendant, by and through its respective members and/or managers, utilized survey results and various other reports, quality indicators, to monitor the care being provided at its Facility.

77. Defendant exercised ultimate authority over all budgets and had final approval over the allocation of resources for staffing, supplies, and operations of the Facility.

78. Defendant, acting through its administrators, members and/or managers, was responsible for supervising the standard of professional practice by the members of the staff at the Facility regarding the conduct at issue herein.

79. Defendant had an obligation to employ competent, qualified and trained staff so as to ensure that proper care, treatment and services were rendered to individuals having medical, nursing and/or custodial needs, such as those presented by Norman Maxwell as set forth herein.

80. As a part of its duties and responsibilities, Defendant had an obligation to maintain and manage the Facility with adequate staff and sufficient resources to ensure the timely recognition and appropriate treatment of the medical, nursing and/or custodial needs of the residents, such as Norman Maxwell, whether within the Facility, or obtained from other medical care providers.

81. Defendant negligently mismanaged and/or reduced staffing levels below the level necessary to provide adequate care to the residents.

82. Defendant had an obligation to establish policies and procedures that addressed the needs of the residents of the Facility, including Norman Maxwell, with respect to the recognition and/or treatment of medical conditions, such as those experienced by Norman Maxwell, so as to ensure that timely and appropriate care was provided for such conditions whether within the Facility, or obtained from other medical providers.

14

Electronically Filed - Bates County Circuit Court - August 10, 2022 - 03:39 PM

83.     Despite its knowledge of the likelihood of harm due to insufficient staffing levels, Defendant disregarded the consequences of its actions, and/or negligently caused staffing levels at the Facility to be set at a level such that the personnel on duty could not and did not meet the needs of the residents, including Norman Maxwell.

84.     Defendant failed to provide the necessary resources and sufficient staff to meet the needs of the Facility's residents, including Norman Maxwell.

85.     Defendant knowingly established staffing levels that created high resident to staff ratios, high resident to nurse ratios and high resident to nurse aide ratios.

86.     Defendant knowingly disregarded patient acuity levels while making staffing decisions, and also knowingly disregarded the minimum time required by the staff to perform essential day-to-day functions and treatments.

87.     The aforementioned acts directly caused injury to Norman Maxwell and were known by Defendant.

88.     Defendant knowingly sacrificed the quality of care received by all of the Facility's residents, including Norman Maxwell, by failing to manage, care, monitor, document, chart, prevent, diagnose and/or treat the injuries and conditions suffered by Norman Maxwell, as described herein.

89.     At the time and place of the incidents hereinafter described, the Facility was owned, possessed, controlled, managed, operated and/or maintained under the exclusive control of Defendant.

90.     At all times relevant, Defendant was operating through its agents, servants, workers, employees, contractors, subcontractors, staff, and/or principals, who acted with actual, apparent and/or ostensible authority, and all of whom were acting within the course and scope of their employment and under the direct and exclusive control of Defendant.

15

91.    The incidents described herein were caused solely and exclusively by reason of the negligence and carelessness of Defendant, its agents, servants, contractors, subcontractors, staff and/or employees, and was due in no part to any act or failure to act on the part of Norman Maxwell.

### COUNT I - WRONGFUL DEATH

92.    Plaintiffs hereby incorporate paragraphs 1 through 91 above, as though fully set forth herein.

93.    Upon accepting Norman Maxwell as a resident at the Facility, Defendant assumed direct, non-delegable duties to Norman Maxwell to provide him with adequate and appropriate healthcare, as well as basic custodial and hygiene services, as set forth herein.

94.    If Defendant was unable or unwilling to meet the needs of Norman Maxwell, it had an affirmative duty and legal obligation to discharge Norman Maxwell from the Facility.

95.    Defendant had the ultimate responsibility of ensuring that the rights of the residents, including Norman Maxwell, were protected.

96.    Defendant owed a non-delegable duty to provide adequate and appropriate medical, skilled nursing, rehabilitation, therapy and custodial care services and supervision to Norman Maxwell and other residents, such as reasonable caregivers would provide under similar circumstances.

97.    Defendant owed a non-delegable duty to the Facility's residents, including Norman Maxwell, to hire, train, and supervise its employees so as to ensure that the Facility was operated and services were provided to Defendant's residents in a safe and reasonable manner.

98.    Defendant, by and through its agents, employees, and/or servants, owed a duty of care to Norman Maxwell to exercise the appropriate skill and care of licensed physicians, nurses, nurse aides, directors of nursing, and/or nursing home administrators.

16

99.    Defendant owed a duty and responsibility to furnish Norman Maxwell with appropriate and competent medical, skilled nursing, rehabilitation, therapy and custodial care services.

100.    Defendant owed and failed to fulfill the following duties to Norman Maxwell:

    a.    to select, train and retain only competent staff;

    b.    to oversee and supervise all persons who practiced nursing, medical and/or skilled healthcare within the Facility;

    c.    to staff the Facility with personnel sufficient both in number and in training to provide the care and services required by the Facility's residents;

    d.    to ensure that the Facility's residents were treated with dignity and respect;

    e.    to maintain sufficient funding, staffing and resources for the Facility so that its residents were provided with the care and services they required;

    f.    to formulate, adopt, and enforce rules, procedures and policies to ensure quality care and healthcare for all residents, and to update the same as required by the applicable standards of care;

    g.    to take adequate measures to rectify known problems in the delivery of hygiene and custodial services as well as in the delivery of medical, skilled nursing, rehabilitation, and therapy care; to warn residents, their family and/or representatives of Defendant's inability to provide adequate care and services when Defendant knew or should have known of its deficiencies in providing such care and services;

    h.    to refuse admission to residents whom Defendant knew or should have known it could not provide reasonable care and services;

    i.    to not admit more residents than Defendant could safely provide adequate care and services; and

    j.    to provide a safe, decent and clean-living environment for the Facility's residents, including Norman Maxwell.

101.    In addition to the direct acts and omissions of the corporate Defendant, the Defendant also acted through its agents, servants and employees, who were in turn acting within the course and scope of their employment under the direct supervision and control of Defendant.

17

102.    Defendant knew, or should have known, of the aforementioned problems that were occurring with the care of Norman Maxwell, as it was placed on actual and/or constructive notice of said problems, through Defendants' own reports.

103.    Defendant, as well as its corporate members, managers, owners, and/or directors of the Facility, breached its duties and was therefore, negligent and careless in its obligations to Norman Maxwell.

104.    The corporate conduct of Defendant was independent of the negligent conduct of the employees of the Facility.

105.    The breaches of duties, general negligence, professional negligence, corporate negligence, and carelessness of Defendant, individually, vicariously and/or acting by and through its officers, directors, members, managers, nurses, nurses aides, and corporate staff who examined, treated and/or communicated the condition of Norman Maxwell, and through the administrative personnel responsible for hiring, retaining and/or dismissing staff, staff supervision and policy-making and enforcement, as well as any agents, servants, employees, contractors, subcontractors and/or consultants of Defendant, were exhibited in the following acts and omissions in the care and treatment of Norman Maxwell:

     a.  failure to hire, utilize, train and retain sufficient staff to meet the residents' needs, including those of Norman Maxwell, which caused Norman Maxwell to suffer the aforementioned injuries and resulting death;

     b.  failure to ensure that Norman Maxwell did not needlessly suffer from preventable and treatable pain;

     c.  failure to properly and timely assess and monitor Norman Maxwell's medical conditions;

     d.  failure to assess and monitor Norman Maxwell and timely notify appropriate physicians as to changes in his condition;

     e.  failure to timely transfer Norman Maxwell to an appropriate facility that could adequately care for him when his physical condition changed;

18

f. failure to obtain a timely consultation from a qualified specialist when Norman Maxwell's physical condition deteriorated;

g. failure to provide Norman Maxwell with an adequate number of staff members knowledgeable of his condition;

h. failure to hire and provide sufficient nursing staff to monitor and care for the patients in the facility, including Norman Maxwell;

i. failure to properly supervise and monitor Norman Maxwell's care;

j. failure to budget sufficient money to recruit and retain competent staff and to provide sufficient support;

k. failure to timely and appropriately notify Norman Maxwell's family and personal representatives when he experienced significant changes in his physical and medical condition, contributing to Norman Maxwell's physical and medical distress and harm, including his resulting death;

l. failure to respond in a timely manner with appropriate medical, nursing and custodial care when Norman Maxwell was in physical and medical distress;

m. failure to ensure that each resident, including Norman Maxwell received, and that the Facility provided, the necessary care and services to attain or maintain the highest practicable physical, mental and psychosocial well-being, in accordance with the comprehensive assessment and plan of care;

n. failure to ensure that Defendant used the results of their assessments to develop, review and revise Norman Maxwell's comprehensive Care Plan;

o. failure to develop, implement and administer to Norman Maxwell an appropriate, comprehensive and individualized Care Plan that included measurable objectives and timetables to meet her medical, nursing, custodial, mental and psychosocial needs describing the services that were to be furnished to attain or maintain her highest practicable physical, mental, and psychosocial well-being, causing Norman Maxwell to suffer the aforementioned physical and medical distress and his resulting death;

p. failure to ensure that the Facility had sufficient nursing staff to provide nursing and custodial care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, including Norman Maxwell, as determined by the residents' assessments and individual plans of care, and the failure to provide services by sufficient number of each of the required types of personnel on a twenty-four hour basis to provide nursing care to all residents, including Norman Maxwell in accordance with the residents' care plans;

q. failure to administer the Facility in a manner that enabled it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental,

19

and psychosocial well-being of each resident;

r.  failure to ensure that the services provided or arranged by the Facility were provided by qualified persons in accordance with each resident's written plan of care;

s.  failure to oversee and supervise all persons who practiced nursing and/or skilled healthcare in the Facility who failed to provide adequate and appropriate health care to prevent Norman Maxwell from suffering the aforementioned physical and medical distress and his resulting death;

t.  failure to formulate, adopt and enforce adequate rules, procedures and policies to prevent Norman Maxwell from suffering the aforementioned physical and medical distress and his resulting death;

u.  failure to manage, care, monitor, document, chart, prevent, diagnose and/or treat the injuries and conditions suffered by Norman Maxwell;

v.  failure to adhere to and update Norman Maxwell's Care Plan after changes in his condition;

w.  failure to provide adequate hygiene to keep Norman Maxwell clean and to preserve his dignity;

x.  failure to prevent Norman Maxwell from developing contractures, including a contracture of the right lower extremity;

y.  failure to identify symptoms of cachexia and ensure that Norman Maxwell was getting a proper nutrition;

z.  failure to prevent and/or address Norman Maxwell's significant weight loss, which was approximately 21.9% of his body weight within an 8-9 month period;

aa. failure to prevent Norman Maxwell from becoming malnourished;

bb. failure to put in place appropriate fall interventions such as rounding for safety, use of nonskid footwear, or that of a bed/chair alarm with Norman Maxwell's underlying history of dementia and known impulsivity;

cc. failure to implement the use of a bed or chair alarm, despite Norman Maxwell's notation of some confusion and attempts to reach/get up without assistance;

dd. failure to turn and reposition Norman Maxwell once every two hours, and more often if and when required;

ee. failure to consistently provide Norman Maxwell with adequate pressure-relieving assistive devices, including special mattresses, beds, and seat cushions;

20

Electronically Filed - Bates County Circuit Court - August 10, 2022 - 03:39 PM

ff. failure to accurately, adequately and consistently monitor, stage, treat and provide care to Norman Maxwell's pressure sores, which resulted in a necrotic and gangrenous right foot requiring amputation, gangrene of the fourth and fifth toes of the right foot, a Stage 3 decubitus ulcer of the left hip, a Stage 2 decubitus ulcer of the right hip, a decubitus ulcer of the sacrum with MASD, and a black/necrotic right ankle wound;

gg. failure to ensure that Norman Maxwell did not suffer from new pressure sores and failure to ensure that his existing pressure sores did not worsen, as required by the acceptable standard of care;

hh. failure to follow its own policies and procedures regarding residents who develop pressure ulcers, when it knew that Norman Maxwell was at risk for skin breakdown at the time of his admission to the Facility;

ii. failure to palpate Norman Maxwell's lower extremity pulses to ensure blood flow to those extremities;

jj. failure to develop, implement and administer to Norman Maxwell appropriate infection control policies, procedures and techniques;

kk. failure to communicate changes in Norman Maxwell' health condition to the physician and Norman Maxwell's family;

ll. failure to timely assess and treat Norman Maxwell; and

mm. failure to maintain compliance with the governmental regulations to which Defendants' delivery of care is compared as part of the annual and complaint state survey process performed by the state of Missouri.

106. As a direct and proximate result of Defendant's acts and omissions, and its breach of the duty of care, negligence, and carelessness, Norman Maxwell suffered (a) severe permanent physical and medical distress and harm resulting in pain, suffering, and resulting in his death, (b) mental anguish, embarrassment, humiliation, degradation, emotional distress, and loss of personal dignity, (c) loss of capacity for enjoyment of life, (d) expense of otherwise unnecessary hospitalizations and medical care, and (e) funeral and burial expenses.

107. As a direct and proximate result of Defendant's negligence, Norman Maxwell suffered severe, permanent and devastating injuries and his resulting death, including, but not

limited to, hospitalizations, medical procedures, a deterioration of his condition, severe physical pain, severe mental anguish and emotional distress, medical and hospital expense, and death.

108.    As a direct and proximate result of the carelessness and negligence of Defendant, Plaintiffs Velvet Maxwell and Shoshana Maxwell have suffered pecuniary loss, medical, hospital and funeral expenses, and have been deprived of Norman Maxwell's services, companionship, comfort, instruction, guidance, counsel, training, support and love.

WHEREFORE, Plaintiffs Velvet Maxwell and Shoshana Maxwell, daughters and heirs of Norman Maxwell, pray for judgment against Defendant and for such sums as are fair and reasonable under the circumstances, for the costs of this action, and for such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims in this action.

Respectfully submitted,

Smith Mohlman Injury Law, LLC

/s/ Oscar P. Espinoza
Oscar P. Espinoza      MO #63640
Rachel E. Smith        MO #56060
701 E. 63rd St., 3rd Floor
Kansas City, MO 64110
P: (816) 866-7711
F: (816) 866-7715
oscar@accidentlawkc.com
rsmith@accidentlawkc.com
**ATTORNEYS FOR PLAINTIFFS**

22